FILED
99 MAR 29 AM 9:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

| | |
|---|---|
| GEORGIA NICHOLS BURNS,           )<br>                                                           )<br>         Plaintiff,                              )<br>                                                           )<br>-vs.-                                                )<br>                                                           )<br>WALKER COUNTY BOARD OF EDUCATION,    )<br>                                                           )<br>         Defendant.                          )  | CV-95-P-973-J |

ENTERED
MAR 2 1999

## MEMORANDUM OPINION

The defendant filed its summary judgment motion on April 21, 1997.[2] The motion was considered at the June 26, 1998 motion docket and was thereafter taken under submission. After careful consideration of the motion, briefs, and evidence presented, the court finds that the defendant's motion for summary judgment is due to be granted.

### Facts[3]

This is a Title VII case brought by Georgia Burns, a black special education teacher at Dora High School, against the Walker County Board of Education. The dispute in this case arose out of Burns's attempt in July 1993 to transfer from her special education position at Dora High School to

---

[2]This case was reassigned from Judge Haltom to Judge Pointer in January of 1998.

[3]The facts herein are presented in the light most favorable to the non-moving party.

1

a regular sixth grade position at another Dora school, Boyd Elementary. As a twenty-year veteran in the Walker County School System, Burns was the most "senior" of the twenty-eight applicants who applied for the position. However, although certified to teach in a regular classroom at the elementary level, Burns has never actually taught anything other than high school special education. After reviewing the applications, the Superintendent of Education recommended to the five member school board that Burns be transferred to the regular sixth grade classroom position. On August 3, 1993, the school board accepted the Superintendent's recommendation.[4]

After learning of Burns's re-assignment, the president of Boyd Elementary School's PTA, Renee Upton, informed the three Boyd Trustees that there were concerns with the decision to transfer Burns to the elementary school One of the Trustees, Richard Lovelady, asked Upton if the fact that Burns was black was a basis for the objection. In response, Upton said that the concerns were with Burns's lack of regular elementary classroom experience and were not race-related. After his conversation with Upton, Lovelady contacted two Dora High School teachers to inquire about Burns. Of the two teachers he contacted, one teacher's comments were negative and the other teacher declined to give any comment at all. Lovelady testified in his deposition that he interpreted both of these remarks as "negative." Another Trustee, Lonnie Creel, also talked to other parents and the Principal at Boyd Elementary about Burns. Creel heard comments dealing only with Burns's lack of regular classroom experience and testified that race was never a factor in the discussions.

Shortly thereafter, a petition signed by about twenty parents, apparently all white, was submitted to the Trustees in opposition to the transfer. The petition refers to Burns's "lack of regular

---

[4]Pursuant to § 16-10-4 of the Alabama Code, written notice of such appointment must be submitted by the Board to the Trustees of the school. Trustees are persons appointed by the Board pursuant to Alabama law. See Ala. Code § 16-10-1.

2

classroom teaching experience, her lack of experience with working with elementary children, and her general teaching reputation." According to the depositions of the three Trustees, all of whom are white, they believed that race had nothing to do with the parents' objection to Burns. Indeed, one of the Trustees, Clinton Gailbreath, testified that he never even knew the plaintiff's race until this lawsuit was filed. All three Trustees admit that the parents' names they recognized on the petition were all white. However, the Trustees recognize that they do not know all of the parents' names on the list.

On August 12, 1993, Burns was approached by the Assistant Superintendent, Harvey Sanford, and urged to accept a position at Boyd Elementary as a special education teacher rather than the regular classroom position to which she had been assigned. Burns refused the request. Four days later, on August 16, 1993, the Trustees sent a letter to the Board unanimously rejecting Burns's assignment.[5] That same day, Burns reported to Boyd for what was apparently the first day of school for teachers. Upon arriving at Boyd, Burns found that her name had been left off of the teacher sign-in sheet and was told by Boyd's principal, James Gann, to return to her previous position at Dora High School. Burns refused to return to Dora High School and continued to report to work at Boyd Elementary through August 18, 1993.

On August 17, 1993, Burns and several of her "supporters" met with assistant superintendent Sanford at the Board's offices. At the meeting, Sanford informed her of the Trustees' objections to her assignment to Boyd. In response, two of Burns's supporters expressed concern that racial bias

---

[5] Under Alabama law, the Trustees may by unanimous consent refuse to accept the assignment of a teacher to their school by sending a written notification to the County Superintendent of Education stating the reasons for the refusal. The Superintendent thereafter has the duty to assign another teacher to the school. See Ala. Code § 16-10-4.

3

was possibly behind the opposition to the plaintiff's employment at Boyd. Apparently without inquiring further into the race issue, Sanford instructed Burns to return to her previous job at Dora High School because she was needed there as a special education teacher.

On August 18, 1993, when Burns again reported to Boyd Elementary school to teach the regular sixth grade elementary school class, she was hand-delivered a letter from Superintendent Fowler informing her that she had been removed from her position at Boyd and would have to return to her previous job at Dora. The Superintendent then selected a white kindergarten teacher who was already employed at Boyd to assume the empty sixth grade position left by Burns.[6]

Burns filed EEO charges in October 1993 and subsequently received her right to sue letter. On April 20, 1995, Burns filed this suit, alleging that she was racially discriminated against by the Walker County School Board when the Trustees rejected her assignment to Boyd.

In support of her position, Burns submitted statistical data to the court concerning the number of black and white teachers in both regular and special education classrooms in Walker County. However, there has been no evidence presented showing that the statistical data is inconsistent with the racial balance in the Walker County population in general. Therefore, the evidence presented by Burns showing only the ratio of black to white Walker County teachers is inconclusive. Furthermore, there is no evidence of other allegedly race-based employment actions. All three Trustees testified that they had never rejected the transfer of a teacher to Boyd during their respective terms until Burns and rejected Burns based only on concerns for her lack of regular elementary classroom experience.

---

[6] Patricia Williams was hired for the sixth grade regular classroom position. Although Williams had less tenure and experience as a teacher overall, she did have several years of actual teaching experience in the elementary setting at Boyd Elementary School.

4

## Analysis

A plaintiff in a Title VII action must show that (1) she is a member of a protected class, (2) an adverse employment action was taken against her, (3) she was replaced by a person outside the protected class, and (4) she was qualified for the position. See Walker v. Mortham, 158 F.3d 1177 (11th Cir. 1998). Once the plaintiff presents a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment action. See McDonnell Douglas Corp. v. Green, 411 U.S. 293 (1973); Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981). The burden then returns to the plaintiff to show that the reason presented by the defendant is a pretext for discrimination. Id.

Here, however, the analysis must go one step further. The plaintiff has asserted a race discrimination claim against the Walker County School Board for an employment action that took place as a result of complaints initially raised by Boyd Elementary School parents. As a result, the court is forced to examine the evidence of racial animus of a group of parents who are three-steps removed from the potentially liable entity. Such an analysis is necessary due to the statutory system of "checks and balances" employed by the Walker County School Board. After a recommendation by the Superintendent, the school board can accept or reject the appointment, subject to the veto power of the Trustees, based on the desires and concerns of interested parents. Due to the unique facts in this case, this court must look at not only the Board's actions, but also the Trustees' and the parents' motives as well.

A. Is the School Board a Decisionmaker?

Without a doubt, the School Board is the ultimate decisionmaker in this case. The Board initially transferred Burns to a regular sixth grade position upon the recommendation of the

5

Superintendent of Education. Based upon the applications submitted for the teaching job, Burns was unquestionably the most tenured applicant, both in terms of number of overall years as a teacher and in number of years as a teacher in Walker County. Ultimately, the Board is also liable for the decision to transfer Burns back to Dora High School, although it made the adverse employment action based upon a recommendation by the Trustees.

B. Are the Trustees Decisionmakers?

By statute, the Trustees of Boyd Elementary School are given unreviewable decisionmaking authority with regard to rejecting the assignment of a teacher to their school. They must meet three basic procedural requirements to reject an assignment, including (1) sending written notification, (3) stating reasons for the refusal, (3) within ten days of the assignment. See Ala. Code § 16-10-4. Once the Trustees unanimously refuse to accept the assignment of a teacher, the Superintendent has no choice but to assign another teacher to the school. Because of the Trustees' unbridled discretion in opposing such transfers, it is necessary to look at the basis for their opposition. In this case, their opposition to Burns was based on concerns from twenty apparently all-white parents.

C. Are the Parents Decisionmakers?

While it is clear that the parents themselves are not the actual decisionmakers in this case because they have power only to make their concerns known, they may have held a position of ultimate influence on the Trustees. As noted in Jones v. Bessemer Carraway Medical Center, "[d]epending upon the circumstances of a case, evidence of discriminatory intent of persons other than the final decisionmaker may be important in some employment discrimination litigation." 151 F.3d 1321, 1323 n.14 (11th Cir. 1998). Even if not the parents are not decisionmakers, the court must look to whether the parents played a role in the decision to refuse Burns's transfer. In this case the

6

testimony clearly indicates that the Trustees would not have rejected Burns but for the parents' concerns.

D. Are the Trustees (and therefore the Board) liable for discrimination by the parents?

There are two ways that the Trustees may be liable for discrimination.[7] First, the Trustees could be liable if there is evidence that the Trustees themselves discriminated against Burns in rejecting her transfer. In this case, there is simply no such evidence, either direct or circumstantial. Indeed, one of the Trustees testified that he did not even know of the plaintiff's race until the discrimination charges were filed. There is also no evidence of racial animus by the other two Trustees in their rejection of Burns. Second, the Trustees could be liable under a "cat's paw" situation "[i]f . . .[the decisionmaker] did not conduct his own independent investigation, and instead merely 'rubber stamped' the recommendations of [those who held a discriminatory animus]." Llampallas v. Mini-Circuits Lab, Inc., 163 F.3d 1236, 1249 (11th Cir. 1998) (quoting Long v. Eastfield College, 88 F.3d 300, 307 (5th Cir. 1996)). In this type of situation, the court must look to whether there is enough evidence for a reasonable jury to conclude that the plaintiff's race was a determinative factor in the parents' recommendation and that the Trustees accepted that recommendation without adequate investigation.

Here, the evidence before the court is insufficient to conclude that race was not a factor in the parents' opposition to Burns. Although the parents cited Burns's lack of experience in regular classroom teaching, race may or may not have also been a determinative factor. There is simply no way for this court to make a determination as to the parents' motives based on the evidence

---

[7] Due to the unique relationship between the Trustees and the School Board, the court assumes for the purposes of this motion that the Trustees are agents of the School Board.

7

presented. Therefore, for the purposes of this motion, the court will assume that the parents did have racially motivated reasons for objecting to Burns. This is not the end of the analysis, however. The court must then look to the Trustees' actions and motives regarding Burns under the assumption that the parents held secret racial motives. Because of the unique situation between the parents and the Trustees in this case, the Trustees could be liable under a "cat's paw" theory if the Trutees acted as a conduit for the parents' discriminatory animus. See Kramer v. Logan County Sch. District, 157 F.3d 620 (8th Cir. 1998).[8] In a cat's paw situation, the person who "actually signs the employee's walking papers" is no more of a discriminator than "the secretary who typed discharge papers knowing nothing of the . . . discrimination that lay behind the discharge." Id. (quoting Shager v. Upjohn Co., 913 F.2d 398, 405 (7th Cir. 1990)). However, if the decisionmaker takes reasonable steps to investigate the concerns of those who held the discriminatory animus, then no cat's paw situation exists.

In this case, the court finds no cat's paw situation. The Trustees' decision to reject Burns was not "simply a tacit approval" of the parents' decision. When Richard Lovelady received the phone call from Renee Upton complaining of Burns, he took reasonable steps to investigate the situation. Lovelady asked Upton whether Burns was black and whether the parents' objections were race-related. Upon hearing assurances from Upton that race was not an issue, Lovelady contacted two of the teachers at Dora High School to inquire about Burns's teaching ability and received what he believed to be negative comments about her teaching qualifications. Further, another Trustee, Creel, talked to several other parents and Boyd's principal about Burns and heard complaints only dealing

---

[8]Although recognizing that the "cat's paw" cases cited herein involve an employer/employee relationship, the court notes that the "cat's paw" analysis is equally applicable in the present case.

8

with Burns's lack of regular teaching experience. It is unrealistic to expect the three Trustees, who serve voluntarily and conduct business rather informally, could do much more in this type of situation. The Trustees, for example, would not be expected to conduct an evidentiary hearing concerning the objections to Burns. Although the plaintiff insists that the Trustees should have contacted black parents specifically to ask about Burns's qualifications to teach in a regular classroom, the court finds that such an investigation was not necessary. Simply put, they did as much as reasonable and did not merely "rubber stamp" the parents' recommendations. No reasonable jury would find otherwise.

E. Other Evidence

The defendant has also shown that while Burns is certified to teach at the elementary level, she has never taught anything other than special education in a high school setting. Further, Patricia Williams, the white female who was eventually given the sixth grade regular classroom position at Boyd, did have seven years of actual experience in a regular elementary school setting. Williams was certified in both Early Childhood and Elementary Education and was already employed at Boyd as a kindergarten teacher.[9] Although Burns makes vague allegations about black special education teachers having a "harder time" transferring to regular classrooms than white special ed teachers[10] and refers to her "supporters'" concerns that the decision was race-based, there is no evidence that

---

[9]Williams taught kindergarten at Boyd Elementary for five years before she was transferred into the sixth grade position. According to the testimony of Boyd Elementary principal James Gann, when a teacher transfers within the same school to a different position, formal transfer procedures are not necessary. Williams was moved from her kindergarten position to the sixth grade position by Gann after the Trustees' rejection of Burns.

[10]Burns admits that she is not aware of another black teacher who has been rejected for a transfer.

9

any other black teacher has been subject to this type of discrimination.[11] Without more, no reasonable jury could find that the Trustes' rejection of Burns was race-related.

### Conclusion

Because no genuine issues of material fact exist, the court finds that the defendant's summary judgment motion is due to be granted.

Date : _March 29_, 1999.

_____
Chief Judge Sam C. Pointer, Jr.

Service List:
    Gayle H. Gear
    Phillip A. Laird

---

[11] The evidence that Principal Gann offered to place Burns in a special education position at Boyd further supports the defendant's position that the objection to Burns was not race-related and was based solely on her lack of regular teaching experience.

10